SIMEON CATLIN,    }    *Plaintiff in error,*

*against*

JAMES JACKSON, *ex dem.*
GRATZ and others,    }    *Defendant in error.*

A seizure of lands, by a sheriff, under a *fieri facias*, does not devest the estate of the debtor; nor does a sale at auction, by the sheriff, unless the purchase money is paid and a deed delivered. A sheriff's sale of lands is within the statute of frauds.

THIS was an action of ejectment, and was tried at the *Otsego* circuit, in *June*, 1806, when a verdict was taken, subject to the opinion of the supreme court on a case, stating the evidence produced at the trial, with liberty to either party to turn the same into a special verdict. In *May* term, 1807, the supreme court, after hearing the case argued, gave judgment for the plaintiff below; and the defendant, the present plaintiff in error, having put the case into form of a *special verdict*, brought

Where a sheriff executed a deed for land sold by him at auction, under a *fi. fa.;* and delivered it to the attorney of the plaintiff, to be delivered to the grantee, on the payment of the purchase-money; it was held that no estate passed by the deed, until the purchase-money was paid, or condition performed. A sheriff may deliver a deed as an *escrow*, but the money must be paid at a day certain, or within a reasonable time, or the sale will be void. What is reasonable time, depends on circumstances; but *it seems* that it cannot extend beyond the return day of the *venditioni exponas*, or at most, the next *vacation*.

By the act of attainder and confiscation, of the 22d *October*, 1779, a mere condition did not become forfeited, so as to vest in the people of the state the right to perform it. Where a person purchased land, at a sheriff's sale, in 1774, and a deed was delivered to a third person, to be delivered to the grantee, on payment of the purchase-money, and the purchaser did not pay the money, but was, afterwards, attainted, in 1779, it was held, that the state could not, by paying the money, perform the condition, or devest the estate of the original debtor or his heirs. And that a private act of the legislature, passed on the petition of the judgment creditor, directing the land to be sold, and the money to be paid to the creditor, did not take away the rights or interests of the debtor or his heirs, or affect any person not a party to the act.

a writ of error to this court, in order to reverse the judg-
ment of the supreme court. (See 2 *Johns. Rep.* 248.)

The material facts, stated in the special verdict, were
as follows: *William Peters* recovered judgment in the
supreme court of the province of *New-York*, in *January*
term, 1770, against *George Croghan*, for 5,739*l.* 12*s.*
2*d.* 1-2. of debt, and 9*l.* 1*s.* damages and costs, which was
duly docketed in the clerk's office, the 10th *February*,
1770. The judgment was, afterwards, in *October*, 1773,
duly revived; and in *January*, 1774, *Peters* issued a
*testatum fieri facias* on the judgment, directed to the
sheriff of *Tryon* county, and returnable to the said court,
on the third *Tuesday* of *April* then next. By virtue of
this execution, the sheriff levied on a tract of land of
which *Croghan* was seised, under a patent granted to
him the 16th *January*, containing 40,000 acres. The
execution was returned in *April* term, 1774, with the
following return endorsed: " In obedience to the within
writ, I have seized certain lands of the within named
*George Croghan*, in my bailiwick, of the value of one
thousand pounds, which remain unsold for want of
buyers." A writ of *venditioni exponas* was thereupon
issued, in the same term, directed to the sheriff, com-
manding him to sell the lands, and have the moneys
arising from the sale, before the court, on the third *Tues-
day* of *July* then next. On the 13th and 14th *July*,
1774, the sheriff sold, at public auction, several parcels
of the lands, and among others the premises in question,
to *Thomas Jones*, being the highest bidder, for 942*l.* 4*s.*
8*d.* The following return was endorsed by the sheriff,
on the writ of *venditioni exponas:* " By virtue of the
within writ to me directed, I have exposed to sale the
lands and tenements within mentioned, of the within
named *George Croghan*, and have thereupon caused to
be made the debt and damages within written, which
certain moneys before our lord the king, at the day and

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

IN ERROR.
····
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON

place within contained, I have ready, as within commanded." But the writ and return were not filed until the 22d day of *March*, 1788. On the 9th *November*, 1774, the sheriff made, sealed and delivered to *James Duane*, (who was the attorney of *William Peters*,) as an *escrow*, to be delivered to *Thomas Jones*, the purchaser, whenever the consideration money should be paid to the said *James Duane*, a deed-poll of the lands so seized and sold by virtue of the said execution. This deed recited a subsequent judgment against *Croghan*, in favour of *John Morton*, and a mortgage of the premises, dated the 14th *February*, 1779, from *Croghan* to *Goldsbrow Banyar*, for securing the payment of 840*l.* and that the sale was made by the consent of *Banyar*, to pay the debts according to their legal priority. The deed acknowledged the receipt of the consideration, and a receipt was endorsed by the sheriff, in full of the consideration money of 952*l.* 4*s.* 8*d.* A release from *Banyar* to *Jones*, dated 30th *November*, 1774, was also endorsed, and delivered also to the said *James Duane*, as an *escrow* to be delivered to *Jones*, whenever the consideration money mentioned in the sheriff's deed, should be paid by *Jones* to *Duane*. The execution of these deeds was proved by *John Lansing*, junior, one of the subscribing witnesses, and a certificate of the proof was endorsed, as follows: " Be it remembered, that on the 5th of *October*, 1789, appeared before me, *Jeremiah Lansing*, one of the masters in chancery in the state of *New-York*, *John Lansing*, jun. Esq. who, being sworn, &c. deposeth and saith, that he saw *Alexander White*, Esq. withinnamed, execute and deliver to *James Duane*, Esq. the within deed, as an *escrow*, to be delivered to the withinnamed *Thomas Jones*, Esq. whenever the consideration money, therein mentioned, should be paid by the said *Thomas Jones* to the said *James Duane*, and that he the said *John Lansing*, jun. and *John Roberts*, jun. subscribed their names

as witnesses thereto: and that he also saw *Goldsbrow Banyar*, Esq. execute the release, &c. and deliver the same to the said *James Duane* as an *escrow*, to be delivered to the said *Jones*, whenever the consideration should be paid by the said *Jones* to the said *Duane*," &c.   And upon this certificate, the deeds were recorded, on the 11th *November*, 1794, in the office of the clerk of the county of *Montgomery*, pursuant to the directions of the act of the legislature, hereinafter mentioned. Before the payment of the consideration money, and while the deeds were held and retained by *Duane*, *Jones*, by virtue of an act of the legislature, entitled, "An act for the forfeiture and sale of the estates of persons who have adhered to the enemies of this state, and for declaring the sovereignty of this state in respect to all property within the same," passed the 22d *October*, 1779, was *attainted* of the offence of adhering to the enemies of the state.   On the 22d *March*, 1788, an act of the legislature was passed, entitled, "An act for the settlement of public accounts, and for other purposes therein mentioned;" the section of which act, relative to this subject, was as follows: "And whereas *William Peters*, of the city of *Philadelphia*, hath, by his petition to the legislature, represented, that, previous to the late war, he obtained a judgment in the supreme court, against *George Croghan*, in which suit a writ of *venditioni exponas* issued to the then sheriff of the then county of *Tryon*, on which writ was endorsed the sum of · 2,241*l.* 0*s.* 4*d.* 1-2. as the amount of the principal, interest, and costs, to be levied thereby; that by virtue of the said writ, *Alexander White*, Esq. the then sheriff of the said county, seized and sold certain lands of the said *George Croghan*; at which sales *Thomas Jones* became a purchaser to the amount of 942*l.* 4*s.*; *John Claus*, to the amount of 66*l.* 13*s.* 4*d.*; *Stephen Delancy*, to the amount of 75*l.*, and *Richard Duncan*, to the amount

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1811

CATLIN
v.
JACKSON.

of 234*l.*; and the said *Alexander White*, on the 9th day of *November*, in the year 1774, executed conveyances to the said several purchasers, for the lands by them respectively purchased; and he delivered the same to *James Duane*, the attorney to the said plaintiff, as *escrows*, to take effect on the payment by the said purchasers severally, of the purchase-money from them respectively due. That the said purchasers not having paid any part of the said purchase-money, the said conveyances still remain in the hands of the said *James Duane*; and the plaintiff in the same suit, by reason of the troubles which soon after took place, and of the attainder of the said *Thomas Jones*, *John Claus*, *Stephen Delancy*, and *Richard Duncan*, hath been prevented from taking measures for compelling them to pay the amount of the purchase-money due from them respectively, or for effecting a payment of the moneys recovered in the said suit; and therefore prayed the interposition of the legislature in his behalf. Therefore, *be it further enacted by the authority aforesaid*, that it shall be lawful for the surveyor-general, as soon as conveniently may be after the passing of this act, to sell, in the manner directed by an act, entitled, " An act for the speedy sale of the confiscated and forfeited estates within this state, and for other purposes therein mentioned, passed 12th *May*, 1784," the lands so purchased by the said *Thomas Jones*, *John Claus*, *Stephen Delancy*, and *Richard Duncan*, and to pay out of the moneys arising by such sale, to the amount of 1,317*l.* 17*s.* 4*d.*; being the whole amount of the purchase-money so due as aforesaid, with lawful interest for the same, from the said 9th day of *November*, in the year 1774, to the judgment creditors of the said *George Croghan*, or his assigns, according to the priority of their respective judgments remaining unsatisfied, and to pay the overplus of the said moneys, if any there shall be, into the treasury of this state. *Provided*, that such payments shall not be made

to the said creditors, until he the said *William Peters*
shall have delivered to the commissioners, the said con-
veyances from the said *Alexander White*, duly proved or
acknowledged, and also the said writ of *venditioni expo-*
*nas*. *And provided further*, that moneys only consisting
in gold or silver, or bills of credit of this state, shall be
received by the commissioners in payment on the sales.
*And provided further*, that the conveyances from the
commissioners in this case, shall not be deemed to ope-
rate as warranties from the state. And the commission-
ers shall accordingly insert in the conveyances, the words,
" these presents are in nowise to operate as warranty,"
immediately before the words " in witness."

" *And be it further enacted by the authority aforesaid*,
That the said surveyor-general shall cause the said writ
of *venditioni exponas* to be filed in the office of the clerk
of the supreme court of this state, and the clerk of said
court is hereby required to receive and file the same
writ accordingly. And the surveyor-general shall cause
the said conveyances from the said *Alexander White*, to
be recorded in the office of the clerk of the county of
*Montgomery*, the expense thereof to be defrayed out of
the moneys to arise by the said sales to be made by the
commissioners as aforesaid."

On the 7th *January*, 1789, the lands mentioned in the
act, were exposed to sale at public auction, by the sur-
veyor-general, and *James Duane*, as the highest bidder,
became the purchaser, for the sum of 2,445*l.* and
the surveyor-general, on the 8th *September*, 1795, exe-
cuted a deed to *James Duane*, for the same lands, pur-
suant to the directions of the act. *Duane*, afterwards,
on the 9th *November*, 1795, executed a deed for the same
lands to *Richard Peters*, *James Biddle*, and *John Bar-*
*clay*, the legal representatives of the said *William Peters*,
under whom the plaintiff in error entered, and held pos-
session. The heirs of *George Croghan*, claiming the

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

lands by descent, are lessors of the plaintiff below, the present defendant in error.

The *reasons* for the judgment of the supreme court were stated by the *Chief Justice*, and were the same as were delivered by him in the court below, and are to be found in the report of the case. (2 *Johns. Rep.* p. 248.)

*Colden*, for the plaintiff in error. The plaintiff below had no right of entry; for it was taken away, 1. By the seizure and sale under the execution ; 2d. By the deed to *Jones;* 3d. By the act of the legislature.

1. Our statute makes no particular provision, as to the manner of selling lands under an execution. The practice has uniformly been to issue a *fie i fac as* against lands, in the same manner as against goods and chattels. There is no distinction between them, in this respect. By the seizure of goods under an execution, the title of the debtor or owner is devested, and the goods are said to be *in custodia legis*. By a lawful seizure, the property of the debtor is devested, and the sheriff is answerable to the plaintiff, for the value.* If, then, the possession of the property, after the seizure, was out of the debtor, and in the sheriff, the lessors of the plaintiff would have no right of entry. It is not denied, and seems to have been taken for granted, in the case of *Simonds* v. *Catlin*,† that were it not for the statute of frauds, a sale by the sheriff would be a conclusive transfer of the title of the debtor. In that case, the court were of opinion, that some deed or note in writing was necessary to take a sale by a sheriff out of the statute of frauds. Lord *Hardwicke*, in the case of *The Attorney-General* v. *Day*,‡ said, that a *judicial sale* was entirely out of the statute. It is true the *Chief Justice*, in the case of *Simonds* v. *Catlin*, seems to think the case of *The Attorney-General* v. *Day* obscure, and the opinion of Lord *Hardwicke* not an authority to that point. But

* 2 *Saund.* 47. and note. 6 *Mod.* 296. 2 *Mod.* 236 *Ladd* v. *Blunt*, 4 *Tyng's Mass. Rep.* 402.

† 2 *Caines*, 61.

‡ 1 *Ves.* 218 221. See *Rob. on Frauds*, 115.

I see no obscurity in the case, and the reason of the opi-
nion given by Lord *Hardwicke* is to be found in the lan-
guage of our statute, that it shall not apply to estates
created by the *act and operat on* of law. The *Chief Jus-*
*tice*, it is true, considers these words as strictly technical,
and confined to estates by *curtesy*, in *dower*, or those
created by a *remitter*. But a sale by a sheriff is by *act*
*of law.*

In *M'Dougall* v. *Striker*,* it was decided, that a pur- * 1 *Johns. Rep.*
chaser of real property, under a *fieri fac·as*, might enter 42. See *Jack.*
and keep possession of the land, in a peaceable manner; *son* v *Stern-*
*bergh*, 1 *Johns.*
and in *Taylor* v. *Cole*,† it was held, that the purchaser *Cas* 153.
might so enter and expel the debtor, and to an action of † 3 *Term Rep.*
trespass, might plead that it was his soil and freehold. 292.
The sheriff may turn the debtor out of possession. Though
a distinction has been made, in regard to sales at auctions,
between lands and chattels, as to the operation of the
statute of frauds, yet that distinction has, by later deci-
sions, in *England*, been done away.‡ ‡ *Rob.* on
*Frauds*, 115,
Admitting, however, that sheriffs' sales under execu- 116.
tion, are within the statute, and that some note in writing
is requisite, still, we contend, that the deed, even if it
was an *escrow*, was a sufficient note or memorandum in
writing.§ It contained every requisite of a note in wri- § *Shep Touch.*
ting within the statute. But was this deed an *escrow*? 60 2 *P. Wms:*
243.

LEWIS, Senator. As the special verdict finds the
fact, that it was delivered as an *escrow*, can it be now
questioned?

*Colden.* We contend that it may. The special ver-
dict, in one place, it is true, finds it an *escrow;* but in
several other places the jury call it a *deed;* and they have
found all the facts necessary to constitute a *deed.* The
jury say that the sheriff made, sealed, and delivered, as
an *escrow*, to *James Duane*, his certain *deed-poll*, which
is set forth in the verdict. It was to be delivered to

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

*Jones*, on payment of the consideration-money to *Duane*, the *attorney of Peters*. The sheriff had executed all his functions, by delivering the conveyance, *as a deed*, at that time; and not to become a deed, on any future contingency or event. The consideration money was not to be paid to the sheriff, but to *Duane*, the *plaintiff's attorney*, evidently as a security for the payment to *Peters*. There is a clear distinction between an instrument delivered to a third person, to take effect, as a deed, upon the doing of some future act by the grantee, and an instrument declared to be the deed of the grantor, and which he delivers to a third person, to be delivered, by that person, to the grantee, upon the payment of a sum of money due from him to the person with whom the deed is deposited. In the first case, the instrument is conditional, and nothing passes till the condition is performed; and until that is done, the grantor may plead *non est factum*. But in the second case, the delivery of the deed by the grantor, *as a deed*, and the depositing of it in the hands of a third person, for the grantee, upon the payment of money to the person with whom it is deposited, constitutes a *trust*. The grantor is *estopped* to say it is not his deed, and the person entitled to the consideration money may enforce payment in a court of chancery, or obtain a decree for the sale of the lands so conveyed, in the same manner as in the case of a deposit of the title deeds of an estate, as security for a debt without any writing, which has been determined to be equivalent to a mortgage, and to create a *lien* on the estate itself.

The law required great strictness and formality in the delivery of a deed as an *escrow*.* If a grantor deliver his deed to a third person, to be delivered to the grantee, on some future event, or the performance of some condition, it is the grantor's deed presently, and the third person is a trustee for the grantee.† Though, perhaps, all the formality stated by *Sheppard* may not be requisite, yet the grantor should call the writing an *escrow*,

* 13 *Vin. Abr. Fait,* (M.) pl. 7. (N.) *Perk.* 142, 143, 144.

† *Shep. Touch.* 58.  2 *Tyng's Mass. Rep.* 447, 451.

and deliver it to a third person, as such. If he is silent, it will be considered as his deed.* From the nature of this transaction, the writing must have been intended as a deed, and delivered as such. It has been improperly called an *escrow;* and calling a deed an *escrow* does not make it such. That depends on the language used, and the manner of delivery.

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

* Com. Dig. 326.
Fait, (A.) 3.
Cruise's Dig.
tit. 32. c. 2. s. 1.

3. As to the act of the 22d *March*, 1788. Whether the writing executed by the sheriff was a deed or an *escrow*, *Jones* had a claim to the land that would have been enforced in a court of equity. He had an equitable interest, which was the subject of forfeiture.

The 13th section of the act of the 22d *October*, 1779, declares, that " all titles, estates and interests, by executory devise, or contingent remainder, shall, on conviction, be as fully forfeited," &c. " as any other titles, claims, estates, or interests whatsoever."

The *condition* in this case was the payment of the consideration money. This was not a personal condition, or inseparable from the person attainted. It could be performed by one person as well as another. The legislature had power to declare the true construction of the act of confiscation ; to say that the claim or interest of *Jones* was within that act; and to perform the condition. Will it be said that the legislature had no power to do this ? Is not the legislature, in this respect, omnipotent? The council of revision was provided as a check to prevent unconstitutional laws ; but if, after a law has been sent back to the legislature, by the council of revision, and is then passed by two thirds of the legislative body, will it be said that the supreme court can declare such a law to be unconstitutional ?

*Henry*, contra. The plaintiff in error, to prevail, must show that the title to *Croghan* has been devested. It is said that the right of entry was taken away by the *seizure* under the *fieri facias*, because the possession was

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1811.

CATLIN
*v.*
JACKSON.

thereby transferred, and the lands remained *in custodia legis.* But a mere seizure does not take away a right of entry. An entry may be tolled in three ways only ; by disseisin and a descent cast ; by an adverse possession for 20 years ; or by devesting the title.

By the statute of 5 *Geo.* II. which first authorized the sale of lands, in the then *British* colonies, for debts, judgments were made a *lien* upon lands only from the time of docketing. Our statute, which is a transcript of 5 *Geo.* II. gave the same effect to a *fieri facias*, in regard to lands, as to chattels, so far as to make them saleable for debts. By the common law, lands could not be *sold* for debts ; they could only be *extended.* An *elegit* was first given by the statute of *Westm.* 2. (13 *Edw.* I.) c. 18. By this statute, at the election of the plaintiff, a moiety of the debtor's lands may be delivered to the creditor until the debt is paid out of the profits. But in *England*, under an *elegit*, the sheriff delivers the *legal* possession only ; and in order to obtain the actual possession, the plaintiff must bring an action of ejectment.\* The sheriff cannot turn the debtor out of the possession of his freehold.

* 3 *Term Rep.*
295. 2 *Eq. Cas.*
*Abr.* 381.

There is a great difference between the seizure of goods and of lands. By the seizure of goods, the possession is devested, and the goods are placed *in custodia legis.* It is not so in regard to lands. The seizure of lands does not change the possession. Could the sheriff maintain *trespass* for entering on lands, after a seizure by him, under a *fieri facias?* He has only a power to sell them ; and by a sale and conveyance of the title, the possession is transferred to the purchaser, who may then enter on the debtor.

The jury do not find the fact of a consummated sale, or the payment of the purchase-money. They find only the evidence, arising from the endorsement on the deed, of its being delivered as an *escrow.* The fact ought to have been found substantially ; not the evidence merely.

Not only the sheriff's deed, but the acts of *Peters*, showed clearly, that *Jones* had not paid the consideration money when he was attainted. Here then was a sale only, and a delivery of the writing, *as an escrow;* but no consummation of the sale. Sheriffs' sales are within the statute of frauds,* the 9th, 10th and 11th sections of which are taken from the 1st, 2d and 3d sections of the stat. 29 *Car.* II. c. 3. Was there any note or writing to bind the parties? Was *Jones* bound? He signed no writing. The sheriff signed no writing, except the return to the execution, which merely mentioned the sale.

The words "act and operation of law," in the 10th section of the statute, are used in contradistinction to the act and operation of the party. The two words are synonymous. The counsel for the plaintiff in error has endeavoured to wrest their meaning in support of his argument. But the obvious and clear signification of them is stated by the *Chief Justice;* and they refer only to estates by *curtesy, dower,* &c. created by mere operation of law.

When land is struck off, at auction, to the highest bidder, it is a mere agreement or contract; and there is no conveyance or assurance, until the money is paid, and a deed executed and delivered. Sales of land at auction are within the statute of frauds, except when made under a decree of the court of chancery; and a receipt of the auctioneer for the deposit money has been held not to be a sufficient agreement in writing to bind the vendor.†

So, a sale of land, by a sheriff, is a mere contract; and to pass any estate, it must be consummated by an *assurance.* At common law, no estate of freehold could pass without a common assurance, stating the names of the parties, the consideration, a description of the premises, the nature and extent of the estate conveyed, &c. So under the statute of *uses,* there must be a covenant containing all the requisites of an assurance; and if there is a *bargain* and *sale*, it must also be in writing. Before the

IN ERROR.

ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

* 2 *Caines,* 61.
sess. 10. c. 44. s.
9, 10, 11.

† 12 *Vesey,* jun.
467. 471. 1 *Ve-
sey,* jun. 221.

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

statute of frauds, assurances might have been by *parol*, accompanied with *livery of seisin*. But since that statute, every conveyance of land must be in writing. A sheriff, selling under a naked power, must make an assurance in order to pass the freehold ; for if he does not describe the nature and extent of the estate, no fee will pass. If he intends to convey the *fee*, there must be words, clearly showing that he means to pass the inheritance.*

* 2 *Bl. Comm.*
297. *Rob. on
Frauds*, 270,
271, 272. 4
*Cruise's Dig*.
tit. 32. c. 1, 2.

It follows, that the seizure of the sheriff is not even evidence of a contract. The sale is void as an agreement, within the statute ; and for a stronger reason, it is void as an assurance.

Then, was the writing executed by the sheriff a deed, sufficient to vest an estate in the purchaser ? The jury have found the fact, that it was delivered *as an escrow*. They were competent to do so ; and the court cannot now examine the evidence, in order to ascertain whether it was *an escrow*. Where an instrument is delivered to a third person to keep, until something is done by the grantee, it is an *escrow*, and does not take effect, as the deed of the grantor, until the condition is performed.†

† 1 *Inst.* 36. a.
*Shep. Touch.*
56, 57, 58, 59.
*Cruise's Dig*.
tit. 32. *Deed*,
c. 2. s. 54, 55,
56.

*Duane* is described as the attorney of *Peters ;* but he was a *third* person, and a stranger to the grantee. That is sufficient to render the writing an *escrow*.

It is said, if the writing was not a deed, it was, at least, an agreement, which might be enforced in a court of equity. But the grantee never signed the agreement, so that the sheriff could not enforce it against him ; and *Jones* could not compel a performance on the part of the sheriff, without paying the purchase-money. Admitting, however, that it was an agreement which might be enforced in equity, this court, sitting as a court of law, cannot take notice of an equity, or trust, nor compel a specific performance. The only question in an action of

‡ 2 *Johns. Rep.*
84. 86.

ejectment is, who has the legal right to the possession.‡

The plaintiff, if he takes the deed, must take it according to the *proof*, which shows that it was delivered as

an *escrow*, or according to the finding of the jury. It
was clear that the delivery was conditional, depending
on the payment of the money ; and it was for the inte-
rest of the creditor that it should be so.

CATLIN
v.
JACKSON.

It is not pretended that the writing from *Banyar* was
not delivered as an *escrow*, and the deed of the sheriff
was the same.

There is no evidence of any intention, on the part of
the sheriff, to pass the estate, until the money was paid ;
nor that *Jones* assented to the delivery, as a deed. It is
not like a deposit of little deeds, which has been con-
sidered as a mortgage in equity. *Duane* was the mere
depositary of the deed.

Then was the condition performed, so as to give ef-
fect to the deed, as an absolute conveyance ?

The sheriff cannot sell on a credit. He is commanded
to have the money in court, by a certain day. It is the
duty of the purchaser to pay the money immediately, or
within a reasonable time. What is reasonable time, is
a question of law.* The payment of money, and the
delivery of deeds, are transitory acts ; and the condition
being transitory, on the performance of which an estate
is to vest, must be performed presently, or in a reason-
able time.† Four years elapsed, after the sale at auc-
tion, before the attainder of *Jones*, and the money was
not then paid. By lapse of time, the condition was gone.
*Jones*, by his neglect, lost the benefit of it. But it may
be said that *Jones* had during his life to perform, unless
quickened by request. This privilege could not descend
to his heirs.‡ *Jones*, by his attainder and banishment,
was *civilly dead*,§ and could not perform the condition,
nor could his heirs or executors. And where a condi-
tion is precedent to the taking of an estate, a court of
chancery cannot relieve, in case of non-performance.¶

* 6 *Comyns'*
*Dig.* 384. *Temp.*

† 1 *Bac. Abr.*
425.    (*Cond.*)
P. 3.

‡ *Co. Litt.* 208.

§ 1 *Bl. Comm.*
183. *Co. Litt.*
133.

¶ 1 *Salk.* 231.

Again, it is said, that by the act of attainder, the state
acquired a right to perform the condition and take the
land. This act is to be construed strictly. The words are,

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

that "all and singular the estate, both real and personal, held or claimed, &c. whether in possession, remainder or reversion, within this state, on the day of the passing of this act, shall be, and are, &c. declared to be forfeit-. ed, and vested in the people of this state."

Had *Jones*, at the time of the attainder, any estate in possession, reversion or remainder, in these lands? Future acquisitions were not touched by the act.

The 13th section extends to executory devises, and contingent remainders. A right to perform the condition was personal, and could not pass to the heirs of *Jones.* It was not an *assignable* interest. *Jones* had no *real estate*, which alone was forfeited. If he had such an estate, it might have been taken in execution.

In *England*, before the statute of 33 *Hen.* VIII. by an act of attainder of all *hereditaments*, a condition was not forfeited, though it was admitted that a condition was a hereditament. So the statute of 26 *Hen.* VIII. declared, in cases of high treason, that " all lands, tene- ments, hereditaments, by any right, title, or means, what- soever, &c. should be forfeited ; yet it was held not to extend to conditions.* Yet the words of that act are broader and more comprehensive than our act of confis- cation.

* *Winchester's* case, 3 *Co.* 1. 3 *Inst.* 19. 1 *Hale's P. C.*240.

That no estate could vest in *Peters*, under the private act of the 22d of *March*, 1788, is clear, from the very language of the act. The legislature do not assert any right or title; the act is declared to be passed on the pe- tition of *Peters;* and it expressly guards against any warranty. It amounted, at most, to a mere *quitclaim*, and gives no title, not before vested in the state.

*T. A. Emmet*, on the same side. The question is, whether *Croghan*, or his heirs, have ever been devested of the freehold in these lands.

In regard to goods and chattels, it is true, the right of possession is in the sheriff, by a seizure; but a freehold

never vests by a mere *seizure*. This distinction is laid down by the court, in the case of *Ladd* v. *Blunt*, decided in *Massachusetts*. It is the common law doctrine. The statute making lands liable for debts did not alter the common law as to common assurances of lands. The distinction is founded on the nature of the two kinds of property. Personal chattels pass by mere delivery. To prevent goods from being transferred by the debtor, they are made liable, from the test of the *fi. fa.* or the delivery of the writ to the sheriff. Lands are bound by the docketing of the judgment, so as to prevent any subsequent alienation by the debtor, to defeat the creditor. When lands are thus held by the judgment, there is no necessity to extend to them the doctrine as to a *fi. fa.* or *extent*, in regard to goods. If the land is in the custody of the law, it is from the time of docketing the judgment, when the law first lays its hands upon it. A *fieri facias* does not touch lands. It is mere process to obtain a *sale* of them. Suppose an action of ejectment, and a demise laid after a judgment docketed against the lessor, or a *fieri facias* issued, would that defeat the action, by showing a title out of the lessor?

Again, may not the debtor, after a judgment, and a *fieri facias* issued, distrain for rent? But could the sheriff distrain for rent, or bring an action of trespass? The sheriff is the mere instrument of the law, to transfer and pass an estate in the land; but he has no estate himself, by virtue of the execution. A sale at auction by him, without a deed or assurance, will not, therefore, pass the land. The sheriff has a mere power to sell and transfer, by virtue of the writ; and nothing passes until the purchase-money is paid, and a deed is executed. A contrary doctrine would be impolitic and unjust. If a mere sale of land, at auction, by a sheriff, without payment of the money, transferred the land to the purchaser, the land could not be again sold, in case the money should never be paid. The debtor, the sheriff,

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

IN ERROR.
......
ALBANY,
Feb & March,
1811.

CATLIN
v.
JACKSON.

and the purchaser, might all become insolvent after the sale, and the purchase-money never be paid. And shall the creditor, then, lose his security in the land? In *Simonds* v. *Catlin*, the sale is supposed to be consummated, by the payment of the money; and the court then say, the estate does not pass, without a deed from the sheriff. In the present case, the sale never was consummated by a payment of the money. The power of a sheriff is very different from a power under the statutes of *uses* and *wills*. It is a power created by law, for public purposes, and is to be regulated by public policy. The law is to decide what is to be a complete execution of the power. Public policy, and the security of the creditor, require that the land of the debtor should not pass, until the money is paid, and the power of the sheriff executed. A power created by a party, is for his own purposes, and is regulated by his own will and caprice; and to suppose any analogy between these different kinds of powers would be dangerous and fallacious. All public officers who sell, for public purposes, execute their power, by means of a *conveyance*. Such is the doctrine laid down in *Simonds* v. *Catlin;* and it is applicable to sales by sheriffs.

Admitting this *escrow* to be a note in writing, yet it is not sufficient, unless the power has been completely executed. It is evidence only of an incomplete agreement. It is not evidence of an agreement at common law, but merely in equity. All the cases on the other side refer to a specific execution of the agreement in a court of equity. They do not apply to the question, in whom is the legal estate vested?

Again, the statute of frauds did not mean to create any new assurance; but only to destroy conveyances by *parol*. A note in writing might supersede the *parol;* but could not supersede the necessity of a *livery of seisin*. A freehold must still pass by *livery of seisin*, or by a deed.

IN ERROR.
·····
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

The words " act and operation of law," do not apply to sheriffs' sales; for we find the same words in the *English* statutes, though in *England* lands could not be sold on a *fieri facias.* But the law will not operate injustice, or put a man out of possession, before the money is paid, or the power completely executed.

The observation of *Lewis,* J. in the case of *Jackson, ex dem. Kane,* v. *Sternbergh,*\* that the purchaser came in under a paramount title, is a mere *dictum.* The other judges were of opinion that he came in under the debtor. If a purchaser comes in by a paramount title, it over-reaches every other title, and he will take the land free from all prior encumbrances of the debtor. Not so, if he comes in under the debtor. The sheriff's deed conveys no more than the title of the debtor.

\* 1 *Johns. Cas.* 153.

The special verdict has found that the deed, or writing, was delivered as *an escrow.* Though in other places it is called a deed, it does not vary the case. A deed is a generic term, for a writing sealed and delivered. The delivery may be absolute or conditional.

All the books use the word deed, when speaking of an *escrow.* They speak of a *deed* delivered as an *escrow.*† A delivery of a deed to a stranger, unless accompanied with words of absolute delivery, is not absolute. Deeds delivered on conditions, are sometimes held to be *deeds,* not *escrows;* but then they are delivered expressly *as deeds.* In the case of *Wheelwright* v. *Wheelwright,*‡ the witness swore that the deed was delivered to the third person, for the use and benefit of the grantee; and the grantor had acknowledged, before a justice of the peace, that it was his act and deed.

† *Perk.* s. 4. 11, 138. 142. 4 *Cruise,* 29. tit. 32. c. 22. s. 54. 56, 57, 58. 13 *Vin. Abr.* 24, (M.) *Shep. Touch.* 50.

‡ 2 *Mass. Rep.* 447.

It is said, if this deed was delivered on condition, or as an *escrow,* that the condition has been performed by the state. Whatever right the state possessed was acquired by the act of confiscation, and in no other way. That act created a new offence, and a forfeiture of certain estates. The common law doctrine, as to forfeitures and

*IN ERROR.* high treason, is inapplicable.    The act is to be construed
**ALBANY,** strictly; and nothing which is not forfeited, in express
Feb. x March, terms, can be deemed to be vested in the state.
1811.

CATLIN
*v*
JACKSON.

But all the writers on the common law agree, that a
condition cannot be forfeited, not even under the word
*hereditament.*    The *English* authorities, therefore, ad-
duced on the other side, are not to be regarded.    We
are only to look to the act of the legislature, to ascertain
what the state did acquire.    The first section reaches
only to vested estates in possession, reversion or re-
mainder.    The 13th section extends the forfeiture to ex-
ecutory devises and contingent remainders.    There are
no words which can authorize the supposition, that the
state became vested with a condition.

Again, when the act of 1788 was passed, on the peti-
tion of *Peters*, the legislature were disabled, by the 5th
and 6th articles of the treaty of peace of 1783, from vest-
ing in itself any confiscated estate.    By the constitution
of the *United States*, all public treaties are declared to be
the supreme law of the land; and no state legislature can
pass a law to contravene them.

Admitting, then, that in 1788, there was a condition
to be performed, on the part of *Jones*, or his heirs, this
state could not take away the right to perform that con-
dition; and thereby gain the estate to itself.    This
would amount to a further confiscation.    The right was
in the heirs of *Croghan* or in *Jones;* and by the interfe-
rence of the state, if allowed, the right of one or the
other must be destroyed, against the express stipulation of
the treaty, and in violation of the supreme law of the land.

Did the state, in fact, perform the condition?    The pay-
ment of the money was a condition precedent, before
any estate could vest; but the legislature first take the
land, and order it to be sold.    Before Queen *Elizabeth*
took possession of *Englefield's* estate, she first perform-
*7 Co. 21.* ed the condition, by tendering a *gold ring.**

Again, it has been shown that before the state inter- fered, the condition was gone, by lapse of time.

But a doctrine bold, unprecedented and dangerous has been advanced, that the legislature have a right, absolutely, to take the property of one person, not for a public purpose, and give it to another. Under our free constitution, such a doctrine can never be admitted. The opinion of Sir *Matthew Hale*, that a statute is in the nature of a judgment, may be law in *England;* but in this state, where the constitution has separated the legislative and the judicial powers, courts can neither nibble at the legislative power, nor can the legislature stride over the judicial.

The legislature cannot establish a new court, which is not to proceed according to the course of common law. By what authority, then, can the legislature erect itself into a court acting, not according to the common law, but arbitrarily and unjustly taking away the property of the heirs of *Croghan*, unsummoned, unheard, and without any compensation? No *scire facias* was issued; nor any notice given to the heirs of *Croghan* to show whether they had paid the amount of the judgment, or not. This act, if it was intended thus to violate private right, was legislative robbery. But the legislature did not mean any such thing; nor have they done any such act of injustice, For nothing but the clearest and most express words can ever authorize so injurious a construction.

But admitting, for a moment, that the legislature did intend to devest this estate, they have overshot their mark, and failed. The act directs the surveyor-general to sell the land, according to the directions of another act, passed the 12th *May*, 1784,* which directs seven commissioners to be appointed, called commissioners of forfeiture, for the several districts of the state, and who are authorized and required to sell all the forfeited estates, and to execute deeds to the purchasers. On

* *Greenleaf's edit Laws,* vol. 1. p. 127. sess. 7. c. 64.

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

the 21st *March*, 1788, a law was passed, that the office of the commissioners of forfeitures should be finally closed, in *September*, 1788; and no provision was made in the act of the 22d *March*, 1788, for a conveyance by the surveyor-general. It is true that the act of 21st *March*, 1788, provides, that all *forfeited estates*, to be sold after *September*, should be sold by the surveyor-general, who should be vested with the same powers, in that respect, as the commissioners. But the power of the surveyor-general relates only to estates forfeited, and unless these lands were forfeited, he had no power to convey them. The power of the surveyor-general must be strictly pursued. This being an act to devest a private right, is to be construed *strictissimi juris*. It follows, therefore, that the deed of the surveyor-general is no better than waste paper; and the lands still remain vested in the heirs of *Croghan*.

If the plaintiff in error is without remedy, it is because *Peters* disregarded the ordinary courts of justice, and resorted to an extraordinary legislative remedy, by which to cut the gordian knot of litigation, and has had the *fieri facias* returned satisfied.

If the property was in *Jones*, why did he not come in and get his money from the sale of the confiscated estates under the act. Or if the property was in the heirs of *Croghan*, why did he not issue a *scire facias*, and proceed, under the judgment, against the property?

But he may, perhaps, have a remedy in equity, or he may apply to the legislature to undo the act; or to the supreme court to have the return taken from the files of the court.

*Riggs*, in reply, said, that in the case of *Simonds v. Catlin*, the court thought it necessary that the *fieri facias*, or *venditioni exponas*, should be returned and filed, in order to make good the title of the purchaser at the sheriff's sale.

The judgment in favour of *Peters* was prior to the

mortgage to *Banyar*, and the amount for which the lands were sold was not sufficient to satisfy the judgment; so that *Banyar* could lose nothing by his release.

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

The jury, it is true, must find the facts, and not the evidence; but there is no evidence that the deed was delivered as an *escrow*.

It is said, that the sheriff's sale is within the statute of frauds. But it is not necessary that there should be such an agreement in writing, as could be enforced in a court of equity, against *Jones*. It is sufficient for the plaintiff in error, holding under the sheriff's sale, that there was a note in writing, signed by the sheriff, the party to be bound. The party signing may be compelled to perform, though the other party has not signed. The sheriff was the person bound to perform.

Again, it is said, that without the payment of the money, the sheriff's deed was inoperative. But in *Simonds* v. *Catlin*, the court were of opinion, that the first deed ought to have been received in evidence, because it went to show that the first sale was valid and binding, and had been carried into effect by the plaintiff's deed.

It is said, that the sheriff's deed ought to specify the nature and quantity of the estate conveyed. But that is not requisite, as he merely conveys all the estate or interest of the debtor, be it more or less.

It is objected, that we claim only an equitable title. But the title of the defendant is a legal purchase and possession, under the sheriff's sale.

Again, it is said, that the money must be paid, in a reasonable time, otherwise the deed is void. But there is no measure of law, by which to ascertain what is a reasonable time. If a sheriff sells on condition that the money is to be paid in a certain time, and the money is not paid at the time, he may resell. Admitting that the money was not paid in a reasonable time, then the title did not pass out of *Croghan*, and the sheriff had a right

IN ERROR.

ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

to find another purchaser, or resell. Why may not the legislature find another purchaser, and do what the sheriff ought to have done; sell the land to satisfy the judgment creditor? The legislature may authorize the surveyor-general, instead of a sheriff, to sell land to pay debts.

But it is said that *Jones* was *civilly dead*, and so could not perform the condition; and it being personal, neither his representatives nor any other person could perform it. In *Marks* v. *Marks*,* where land was devised to *B.* with remainder to *C.* provided if *D.* paid 500 pounds to *C.* within three months after the death of *B.* then *D.* and his heirs should have the land; Lord Ch. *Parker* and Sir *Joseph Jekyl* were of opinion, that the payment of the money was not personal to *D.* but might be performed by the heir; and though that was an executory devise, yet if it had been a condition at common law, the payment of the money would not be a personal act, but might be performed by the heir.

Again, it is said, that the legislature intended to give a mere quitclaim, and not to convey any title. But it is evident that the legislature meant to do precisely what the sheriff might and ought to have done; and, therefore, directed the surveyor-general to execute such a deed as the sheriff would have given; that is, a deed without warranty, which should convey the debtor's interest in the land.

It is said, that a title cannot pass by a sheriff's sale, without a deed, and that an assurance at common law is requisite to transfer the estate. But by the common law, no person but the owner of the estate, can convey. A sheriff cannot transfer the property of another person. Sheriffs' sales rest altogether on the statute, and are not governed by the rules of common law.

The statute gives a sheriff power to take the land of the debtor, and to sell it, in order to satisfy the creditor. Formerly a court of equity did not feel itself authorized

to transfer a mortgaged estate, but directed the mort-
gagor or mortgagee to execute a conveyance. Now,
on a sale, the master, under the decree, makes out
a perfect conveyance, and delivers or tenders it to the
purchaser; and if he refuses to pay the money and take
the deed, the master reports the facts to the court, and
the master is ordered to resell. May not the estate, after
the sale, be considered as vested in the purchaser, subject
to be devested by a subsequent sale, in case the money
is not paid ? The sheriff, or master, is a mere agent of
the law, having no title in the property, but merely an au-
thority to convert the property of the debtor or mortga-
gor, into money, to pay the creditor. A sheriff, then,
might, under the deed, sell the estate of the purchaser to
raise the money, as well as he could the estate of the
debtor. This removes all difficulties as to the freehold
being in the debtor, or in *abeyance.*

The case of *Wheelwright* v. *Wheelwright** is in point, * 2 *Mass. Rep.*
as to the delivery of the deed of the sheriff, and shows 447.
that there may be a *conditional* delivery which will vest
the estate presently in the grantee. That case was not
decided on the doctrine of *estoppel,* arising from the
grantor's having acknowledged before a justice that it
was his act and deed. In *Jackson, ex dem. M'Crea,* v.
*Dunlap,*† this court held, that where a deed was executed † 1 *Johns. Cas.*
and acknowledged before a master in chancery, but re- 114.
tained by the grantee, by way of security, until the con-
sideration money was paid, no estate passed.

Again, it is said, that the surveyor-general had no au-
thority to execute a deed. But he was expressly direct-
ed and empowered to sell the land, and pay the money
over. He must, therefore, have a power to execute a
deed to the purchaser. The reference to the commis-
sioners of forfeiture may have been left in the act, by
mistake, and in consequence of not adverting to the act
that was passed the day before, for abolishing that office.

Having thus answered particular objections, he pro-
ceeded to state the general grounds on which the plaintiff

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

in error relied : 1. That the deed to *Jones* was so far a perfect deed, as to pass the estate to him, by force of the sale.    It is true that the jury find the deed was delivered, *as an escrow*, but they also find facts inconsistent with that fact.    In judgment of law, from the whole case, it was not an *escrow;* and this court must say that the jury mistook in calling it such.    Every thing was done on the part of the sheriff, which was necessary for a perfect conveyance of the estate; and the deed was left with *Duane*, not for the benefit of the sheriff.    The money was not to be paid to him, but to *Duane*, the plaintiff's attorney.    In *Wheelwright* v. *Wheelwright*, the witness called the deed an *escrow*, and considered it as such; but the court said that he was mistaken.    It depends on what is done, not on what is said, whether the deed is to be considered an *escrow*, or not.*

*6 *Mod.* 217, 218.

2. Suppose the deed was no more than an *escrow*, and that *Jones* had only a right to call on *Duane*, and demand a deed, on payment of the money ; then he had a *claim* to the land, which he could enforce, on payment of the money.    It has been called a *condition*.    True, it was in the nature of a condition, for *Jones* was not to have the land, without paying the money.    But it is not that kind of *condition* which is considered in law as not *assignable*.†    It is rather a *contract*, under which *Jones* claimed the estate.    It is, in the language of the act of attainder, an estate *claimed*, though not held.    The act of 1788 has given this construction to the act of attainder ; and the interpretation having been thus settled by the legislature, all courts must be bound by that construction.    And this is the fair and legal construction; for the property so acquired, was to be held by the state, in trust, to pay the debts of the person attainted.    In an insolvent act, the words " all the estate real and personal" of the debtor, comprehend every kind of estate whatever, which the debtor could have, for the beneficial purpose of paying his debts.

†*Co. Litt.* 219. b.

3. But suppose that nothing passed by the deed to

*Jones*, were *Peters* and his heirs to be left without reme-
dy? Is there any thing novel, unprecedented, or unjust, in
a legislature passing a law to render perfect an act left
imperfect by an officer? Is it not in furtherance of jus-
tice? It is, in truth, a plain act of justice. The legisla-
ture not only had the power to do this, but they were
right in lending their aid, to enable a judgment creditor
to obtain, in this way, his just debt.

It has been suggested that the supreme court may di-
rect the *vend tioni exponas* to be taken off the file; but
after the legislature has ordered the writ to be placed
there, by what authority could the supreme court re-
move it? By direction of the legislature, also, the deed
from the sheriff to *Jones* has been recorded, and remains
as a matter of record, and a complete bar to *Peters* and
his representatives.

Sir *Matthew Hale* says, that parliament have a right,
in every case, to settle a controversy, and to decide to
whom land in dispute belongs; and no court can ever
after call it in question. Our legislature, in this respect,
have the same power as a *British* parliament.

The court below say that the legislature have not, in
*express terms*, declared that the estate of *Croghan* was
devested. But the act must necessarily be so under-
stood; for the directions of the act are utterly inconsist-
ent with the idea of any title remaining in *Croghan;* and
the act could have no operation, if the estate was in
*Croghan* or his heirs.

THE CHANCELLOR. The questions arising in this case,
come up on a special verdict, on which a judgment has
been rendered in the supreme court, for the defendant in
error, the lessor of the plaintiff, in the court below.

In examining the errors assigned, which in their form
are general, the record *only* affords the test of their ex-
istence; and as, in this case, they are assigned on the
matter of the special verdict, it will be necessary to at-

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

tend to the points found by it, from which it was impo-sed on the court below, to determine, as a question of law, arising upon the facts found, whether a judgment ought legally to be rendered for the plaintiff, or the defendant; and if, in adjudging on those points, they have erred, it is the duty of this court to correct the error; and if they have not erred, to affirm the judgment.

Both parties having relied on *George Croghan*, as their common source of title, his seisin, and the descent from him to the lessor of the plaintiff, are not matters of controversy; though necessarily found by the jury, as facts essential to be presented to the court. So as to the attainder of *Thomas Jones*, as a person named in the confiscation act.

[Here his honour stated the substance of the special verdict.]

To determine whether the errors relied upon in argument, are such as the judgment of the supreme court ought to be reversed, it becomes necessary to examine, 1. Whether the seizure of the sheriff devested the seisin of *George Croghan?*

2. Whether the sale at auction devested it?

3. Whether the sheriff's deed was delivered as an *escrow;* and, if so, what was its legal effect?

4. Whether the act of the legislature, of the 22d *October*, 1789, devested the interest of the lessor?

1. Preliminarily to the consideration of these points, it will be proper to remark, that the finding of the jury of any fact, as existing, is in exclusion of the inducements to such finding, on a view of the evidence which was the ground of their verdict; that whatever fact is not found is deemed not to exist, and that the court cannot supply any defects in such finding by intendment.

The first question that presents, is as to the effect of the sheriff's seizure. From the nature of the subject, we cannot expect to find any governing cases among those

adjudged in the *English* courts. There are some, how- <span>IN ERROR.</span>
ever, which have an analogy to it.

Previous to the statute of 5 *Geo.* II. c. 7. no judicial
sales of land could be made here, under any common
law process; and whether the *elegit* was ever introduced
in practice, is doubtful, as the small value of the in-
come of real estates, afforded little inducement to resort
to it, as a means of satisfying a debt due upon a judg-
ment; but, upon the passing of that statute, though
professedly intended to enable the *British* subjects in
*England*, to sell real estates, on execution in the colo-
nies, in order to satisfy the debts due to the former, it
received a liberality of construction here, which extend-
ed it to all judgments; and in practice it was even applied
to the sale of lands of a testator or intestate, on judg-
ments recovered against their executors or administra-
tors, on the ground that the statute had completely con-
verted real into personal estate, as far as respected the
satisfaction of debts. Many estates are now held under
sales of that kind, and the 5th section of the act passed
the 4th of *April*, 1786, (*Jones and Varick's edit. Laws of
N. Y.* vol. 1. p. 277.) expressly restrains such sales; a
restraint perpetuated by an existing statute. (*Rev. Laws*,
vol. 1. p. 538. s. 13. sess. 24. c. 174.

The statute 5 *Geo.* II. enacts, " that the houses, lands,
negroes, and other hereditaments, and real estate in any of
the plantations, belonging to any person indebted, shall
be liable to, and chargeable with, all just debts, duties,
and demands, and shall be *assets* for the satisfaction
thereof, in like manner as real estates are, by the laws
of *England*, liable to the satisfaction of debts *due by bonds*,
or other specialty, and shall be subject to the like *reme-
dies, proceedings and process*, in any court of law or
equity, in any of the said plantations, *selling or disposing*
of any such houses, lands, negroes and other heredita-
ments and real estates, towards the satisfaction of such
debts, duties and demands, and in like manner as personal

IN ERROR.

ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

*IN ERROR.*

ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

estates in any of the said plantations respectively, are seized, extended, sold, or disposed of, for the satisfaction of debts."

The construction of this statute presents some difficulty. The section quoted is laboured and complicated; but it appears to me that the first member of it prescribes both the remedy and mode of seizing, extending, selling or disposing of land which, as far as there are any analogous proceedings in any courts of law or equity, in the plantations, in which the real estate is situated, must be conformed to them; but to prevent all possibility of doubt, it is added, "*and in like manner* as personal estates are seized, *extended, sold or disposed of, absolutely,* so as to pass the whole interest of the debtor to the purchaser.

In several essentials the effect of the execution must be different from a *fi. fa.* levied on personal estate only. The delivery of the *fi. fa.* gives no new rights to the plaintiff, and vests no new interests. The general *lien* it created by the judgment and the execution, is merely to give that *lien* effect, not by vesting a possessory right to the land affected by it, in the plaintiff, but by designating it for a conversion into money by the operation of the *fi. fa.* and the act of the sheriff, by virtue of it. It is not so as to personal property. That is bound from the delivery of the *fi. fa.* to the sheriff. When he seizes, he may remove it for safe keeping, and this not only to give effect to the seizure, but for his own security. He may maintain trover or trespass, for converting or injuring it, on account of the special property he acquires in it by the seizure. (2 *Saund.* 47.) So a carrier may maintain trover against a stranger, who takes away goods held by him to carry; and *Holt,* Ch. J. ruled, that if goods were rescued, the sheriff was not liable, which could not be, if he acquired a property absolute. (1 *Vent.* 52. 1 *Brownlow,* 132.)

None of these reasons apply to real estate. It is not necessary that the sheriff should possess himself of it, for safe keeping. It is not possible to eloign it, and

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

the terms of the *fieri facias* give him no other authority than such as is incident to the duty he is required to perform. The cases from 2 *Show.* 85. and 3 *Term Rep.* 395. show, that, in *England*, upon an *extent*, under an *elegit*, the vendee is put to his ejectment; and so has been the practice here, which appears as well from the uniform mode of conducting seizures of real estate, as from some cases reported on that subject.

In practice, the defendant, if he is the occupant, is never disturbed, till the sale is consummated. A contrary practice would expose the defendant's property to waste and destruction, impair the plaintiff's security, and involve the sheriff in very inconvenient and useless responsibilities.

It has been said, that the estate was in *custodia legis*, and in *abeyance*. There is no principle of law, which can, in its operation, devest an estate, to put it in *abeyance*. (*Co. Litt.* 342. *Vin. Abr.* tit. *Abeyance*, pl. 12.) That is produced only of necessity. The law never allows it to be the act of a party; and neither law nor reason exists to justify the application of the doctrine to an act of the sheriff. It is limited to a very few cases; never created *eo instanti;* but is the effect of some contingent event, which would frustrate the purposes of justice, if it was not interposed. If applied to the incongruous operations of *abeyance* and *remitter*, it might be required to coöperate to restore the defendant to the *statui quo*, if, by any accident, a sale should not succeed the seizure, or the debt be satisfied. This species of losing and acquiring seisin, cannot be deduced from any legal principle. It is not congenial to the genius of our law, thus to vest and devest a seisin, by mere volition, without an act indicating the intent of transferring it from one to the other. The word imports an actual, not an ideal possession; for even an entry for the purpose of asserting a claim, does not *oust* the seisin of the actual occupant.

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

I am satisfied, that the interest of *Croghan* was not otherwise affected by the seizure, than as it became the inceptive step to a legal transmutation of his estate, if other requisites had followed to consummate it.

2. The second question is, whether the sale at auction devested the seisin?

Auction is calculated to ascertain the terms on which property offered for sale is to become the purchaser's.

The terms of payment, quantity, and extent of the interest to be disposed of, are prescribed by the person holding the auction. The bidder consummates them by adding the sum. These, all other legal requisites being complied with, constitute, not a conveyance, but, at most, *a contract for a conveyance.* The one party contracts for the delivery of a conveyance, the other to pay the sum bid, as a concurrent act, at a specified time, or, if without a specification of time, within a reasonable time.

Without the payment of the money, no right can accrue to the purchaser; for, if a bill was filed in chancery for a specific performance by the vendor, unless *the* terms had imposed on him the delivery of a conveyance, precedent to the payment, he could only be bound to offer it, upon receiving the purchase-money.

If the money is not paid, or if the sale does not operate to satisfy the debt, *pro tanto,* what benefit arises to the owner, as the consideration to him for devesting it?

In *Pennsylvania* (1 *Dallas,* 419.) it would be competent for a sheriff to return that the money was not paid, and that the premises remained unsold. In chancery, if the money bid at auction is not paid, it is the uniform practice to annul the sale. In *England,* the biddings are often opened, before the master's report is confirmed, which could not possibly be, if the mere sale at auction vested the seisin in the bidder. A contrary doctrine would render judicial sales intolerably perplexing

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

to all parties concerned; to the sheriff, because it would expose him to incalculable embarrassments; to the plaintiff, because it would tend to delay the satisfaction of his judgment; to the defendant, because it would place the care and management of his estate out of his reach, long before it could possibly be applied to the satisfaction of the plaintiff, in his exoneration. The doctrine in the extent contended for, would conclude to devest the defendant of his estate, as in this case, from 1774 to 1779, without satisfying a cent of the debt, or even preventing the interest from running against him; for if that was in reasonable time, the mere payment of the sum bid, would entitle the purchaser to a convey-ance. In every point deduced from strict law, from its liberal exposition, from general principles, or from con-siderations of inconvenience, this doctrine is unfounded. The defendant *Croghan's* right of entry was not *tolled*, and the descent found by the jury devolved his right upon his heirs.

3. As to the third point, whether the sheriff's deed was delivered, as an *escrow*; and, if so, what was its legal effect?·

That the sheriff's deed was delivered to *James Duane*, as an *escrow*, to be delivered to *Thomas Jones*, whenever the consideration money therein mentioned, should be paid by him to the said *James Duane*, is a fact found by the verdict. That the money has ever been so paid, has not been found; and on the performance of the con-dition of payment *only*, could it operate. If *Jones* was, now, in full life, legally capable of performing the act required, (the payment,) and if even it were possible to pronounce that it was still competent for him to give the deed effect, by *paying*, the fact, that it was unpaid at the time of the commencement of the action, and not even paid at this moment, must stare him in the face, and repel every pretence that the deed could operate in his favour. *Croghan* has never forfeited his estate.

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

The receipt of the money by the treasurer could not affect his right. It was neither a payment to him, his heirs, or to *Duane;* for so far from being a payment, before the sale under the act of 1788, the right of disposition has been exercised, before any payment made; and to all legal purposes, the consideration money was still unpaid, as related to the condition on which the deed was, by its second delivery, to become operative. If so, how can a title be derived under a deed, which could not, even now, pass the estate described in it, to the purchaser, were he in full life; and which has never been called into existence by the payment of the consideration money to *Duane,* by the purchaser. If he could not derive a title under it, the persons claiming under him, must, necessarily, be equally destitute of it.

The verdict has found the deed of the sheriff, the release of *Goldsbrow Banyar,* and the proof of the execution before a master in chancery; but those facts conclude nothing here; for though they might be inducements to a jury, to find the delivery of the writings as *escrows,* it is not expressed, and cannot be intended, that they were either the sole inducement, or combined with others, to the finding of the delivery of the sheriff's deed, as an *escrow.* There might be others, but whether there were or not, the jury have not so found, as to enable this court to judge, whether the inference, that the deed was delivered as an *escrow,* was correctly deduced from those facts, or not. The court cannot infer the existence of one fact from another, positively found by the jury, in the matter on which it is required to pronounce the law.

The sale at auction was made before the return day of the *venditioni exponas.* I do not mean to examine whether a sheriff can, on any occasion, legally execute a deed, as an *escrow;* though the inclination of my mind is, that he may, limiting it to a day certain, within a reasonable time; for it is no more than the law would

IN ERROR.
.....
ALBANY,
Feb & March,
1811

CATLIN
v
JACKSON.

impose on him, to offer the deed, when he required payment of the consideration money; and the second delivery could only give it operation; or, by referring it to a reasonable time, generally; in which case, circumstances must enter into the estimate of what constituted a reasonable time, either the return day of the *venditioni exponas*, or, at farthest, the next *vacation;* and, when that elapsed, the sale might well be considered as inoperative.

The acts of executing the deed, of delivering it as an *escrow*, of retaining it as such, and the neglect of executing a compliance with the condition of the delivery, were exclusively those of the plaintiff's attorney in the suit in the supreme court, and of the sheriff; for the defendant *Croghan's* right was treated as extinguished, and with those transactions he had no privity. The real estate remained untouched, the consideration money unpaid, the deed undelivered, the *venditioni exponas* unfiled, and the whole so modelled, as to subserve the view of the plaintiff.

Suppose *Croghan* vigilant and attentive to his interests, of which there is no evidence, and disposed to ascertain the state of his property, by repairing to the clerk's office, he might have discovered that a *venditioni exponas* had issued, but that it had not been returned. By applying to the sheriff, or Mr. *Duane*, if they were alive and accessible, he might have acquired the information that an auction sale had been made; but it must have been the mere effect of candour, if they had gone a step further, and explained the mode to which a resort had been had to devest him of his interest, so as to put it in his power to penetrate the clouds with which his estate was enveloped; and it cannot possibly consist with any legal or rational exposition of the powers of a sheriff, to permit measures of this kind, to devest an estate, after so long a lapse of time. Hence, long before the civil death of *Jones*, the reasonable time in which the deed might have been made absolute, by the

*IN ERROR.*

ALBANY,
Feb. & March,
1811.

CATLIN
v
JACKSON.

payment of the consideration money, had elapsed.  If the purchaser had paid tardily, and *Croghan* or his heirs had laid by, and suffered the lands sold to be occupied under the sale, without interruption, it might present other considerations not necessary to be now pursued.

If nothing passed by the deed, the act of attainder could not create a right, once *in posse,* but never vested, or revive such a one as had been lost by the *laches* of the party in whose favour it was intended to operate, prior to its passing; and however broad and comprehensive the terms of the act might be, it could not affect the estate in question.

By the verdict, it is found that the sheriff returned, that he had the moneys directed to be levied, ready " before our lord the king, at the day and place within contained."  The day and place clearly relate to the return day, and to the court then held, at which the *venditioni exponas* was made returnable, and could relate to no other. From the special verdict it appears that the sheriff had seized 40,000 acres of land of the defendant *Croghan;* that he sold divers parcels of it, and, among others, to *Thomas Jones,* the premises in question.  There is no fact found to rebut the return, if it could be rebutted or traversed; that he had the money ready at the return day; and if so, the debt was satisfied.  His authority had ceased, and the execution of any deed subsequent, would certainly be of questionable validity;  for from aught that appears, the debt might have been satisfied by the sale of the other parcels.  That the return was not filed till 1788, does not destroy its relation to the return day.  It was at most a filing *nunc pro tunc;* and the withholding it from the proper office could not attach any legal effect to it, but such as it would have had if it had been regularly filed.

This leads me to the last point, whether the act of the 22d *March,* 1788, devested the lessors' interest?

*IN ERROR.*

*ALBANY,*
Feb. & March,
1811.

CATLIN
v.
JACKSON.

It appears, from its terms, to have been passed upon the suggestion and prayer of *William Peters.* It was, as far as it relates to this subject, a private act. It has no saving of the rights of others; but its professed object is to convert the land described in it and in the sheriff's deed, into money; to apply so much of it as might be necessary, to the satisfaction of the consideration money, together with the interest, to the judgment creditors of the said *George Croghan,* or their heirs and assigns, according to the priority of their respective judgments remaining unsatisfied; and to pay the overplus of the said moneys, if any there were, into the treasury of this state. But whether the payment into the treasury was made, for the ulterior benefit of persons interested, or as part of a fund vested in the state, by the attainder of *Jones,* is not expressed; but if for the latter purpose, it must evidently have been under the erroneous opinion that the residuary interest of *Jones* had so vested.

That the state was not to be responsible, is evident from the section expressly imposing a departure from the usual mode of conveyance of forfeited estates, by the omission of the warranty.

The act, for the reasons assigned by the supreme court, could not affect *Croghan's* property. It is not its professed object; and no legal intendment can be admitted to support a construction so replete with injustice. He was a stranger to the act. A violation of private rights, by legislative acts, is never to be presumed; and a decent respect to that branch of the government of the state, must ever repel a presumption of that kind. In doubtful cases, the court would uniformly give a construction consistent with the provisions of the constitution; and it must be a clear and unequivocal intent, which the court would not meet with the most liberal construction, in order to prevent its operating to the prejudice of private right. It is not presumable that the legislature will ever be guilty of such a palpable vio-

IN ERROR.
ᐧᐧᐧᐧᐧ
ALBANY,
Feb. & March,
1811.

CATLIN
v.
JACKSON.

lation of the constitution. If they should do so, it may present an interesting epoch in the history of our juris= prudence; but it cannot be useful to anticipate it.

The present case is that of a private act, passed at the instance of the parties, to remove embarrassments in the arrangements of their interests only, which cannot affect strangers, or devest the rights of others, not parties or privies to it. It is a species of conveyance, which, like all others, the parties take at their peril.

The cautions observed by the *British* parliament, with respect to private acts, are particularly mentioned by *Blackstone*, (2 *Black. Comm.* 345.) under the head of " *Alienation by matter of Record.*" Speaking of private statutes, he says, " Acts of this kind are, however, carried on in both houses, with great deliberation and caution; particularly in the house of lords, they are generally referred to two judges, to examine and report the facts alleged, and to settle all technical forms. No= thing, also, is done without the consent, expressly given, of all parties in being, and capable of consent, that have the remotest interest in the matter, unless such consent shall appear to be perversely, and without any reason, withheld. And, as before hinted, an equivalent in mo= ney or other estate, is usually settled upon infants or persons not *in esse*, or not of capacity to act for them= selves, who are to be concluded by this act; and a ge= neral saving is constantly added, at the close of the bill, of the rights and interests of all persons whatsoever, except those whose consent is so given or purchased, and who are therein particularly named, though it has been holden, that even if such saving be omitted, the act shall bind none but the parties."

He then adds, " A law thus made, though it binds all parties to the bill, is yet looked upon more as a pri= vate conveyance, than as the solemn act of the legisla= ture."

IN ERROR.
.....
A. B .NY,
Feb & March,
'811
CA.LIN
v.
JACKSON.

If in *Great Britain*, where all these precautionary measures are taken to preserve the interests of strangers, private acts are restrained to the parties only, who are evidenced to be such, by consent to them, either in person, or by those who legally manage their concerns for them, and if, when the suggestions on which the act is passed are proved fraudulent, a court of chancery will relieve against them, which is there well settled, the general practice, which obtains here, with respect to the passing such acts generally, on the bare suggestion of the applicants, affords additional and very cogent reasons against relaxing such restraints ; and it can scarcely be necessary to add, to devest an interest of a stranger to it, is contrary to the clearest dictates. of justice, and repugnant to the constitution.

Whenever a case is so nicely poised, as to render it doubtful which of the parties is legally entitled to the judgment of the court, considerations of hardship may be mingled, to aid in preponderating the scales of justice, on one side or the other: but where the law is clear, it must prevail, regardless of considerations of that kind. We sit not here to pass upon the personal merits of the parties in controversy, but upon their rights; nor is it imposed on the court to inquire what ulterior remedies are in the reach of either. They must be left to seek them, as they may be advised, under the certain assurance, that if there is a right, there is a legal remedy to enforce it. The imperious duty of this court, prescribed by the solemnity of the official oath of its members, is to decide according to law.

Every view, in which I have been able to place this subject, concludes to the affirmance of the judgment of the supreme court, and I am, therefore, for affirming it.

This being the unanimous opinion of the court, it was thereupon ORDERED and ADJUDGED, that the judg-

*IN ERROR.*

ALBANY,
Feb. & March,
1811.

ment of the supreme court be affirmed; with double costs to be taxed, &c. and that the record be remitted to the said court.

Judgment affirmed.